I'm Chris Carson. I'm Counsel for the 8th District Plans. I'm here, I'll try not to be too repetitive. I've heard that before. May I be sure you represent the plan, not an insurance company? That is correct, Your Honor. I am Plan Counsel for the 8th District Electrical Pension Fund and Benefit Fund. We are the people whose good deeds did not go unpunished in this plan. We are the ones, we went first with Judge Levy, we negotiated settlements with our bonding companies and the class actions that were filed against the trustees, service provider claims. We are the ones who actually had the largest amount of third party recoveries to date. To get to a point that I heard in the prior argument, there's nothing in ERISA that provides an exception if the fiduciary is a receiver. ERISA draws a boundary within which there's certain types of permissible conduct that a fiduciary, including a receiver, can engage in. Using the MIMO formula is a good example of that. That's a permissible exercise of fiduciary power there. What a receiver cannot do is reach outside of that boundary to grab what are the plan assets, the other claims, the third party claims, that are not only plan assets but that are collateral sources, and in effect bring those into the receivership for an adjustment in distribution. You see, the receiver has done something that trustees themselves of the plan could not do. The example raised by Ms. Elias, we have a pension fund, we have a health fund. Around the country, health funds are in serious trouble because of low earnings over the last few years. The pension fund couldn't say, well, we got $650,000 from our attorney, we got $5 million from Siegel Advisors, the class actions settled, although they're not paid yet, for X million dollars. We will give more to the health fund. No, you cannot do that because ERISA is a bar to that type of conduct. That is a breach of fiduciary duty. So you can't have a situation here where the common law, that is the common law of federal equity receivership, somehow prevails or is able to conflict with ERISA. ERISA gives you that boundary which courts receivers must respect. And so reaching over to grab those plan assets that my plans have recovered is simply unlawful. There's no troublesome precedent in you reversing the district court's order on that basis. Because if you leave this plan intact, the way it is set up, it can be used for all kinds of problematic conduct in the future, probably the biggest of which is allowing other fiduciaries to use this as a smoke screen and cover up their own bad conduct. One of the things that this plan clearly allows, there are plenty of other ERISA plans out there who have done nothing at all with respect to their service providers, with respect to even investigating themselves. And these investments in many respects were remarkably imprudent. You didn't need to delve more than five or ten pages into a couple documents to see what problems were, Wilshire, things like that. These fiduciaries have a duty to investigate their own conduct. This plan gives them a reason not to do that. So those who were diligent are in effect penalized, and those who are not I'm not sure it gives them a reason not to do that, but it reduces the penalty for their improvidence. I'm sorry? I'm not sure it gives them a reason not to do it. They still lost money, but it reduces the penalty for their having been negligent. Given the fact that there's a discount in anything they might recover, that can be used as a reason to not investigate otherwise inappropriate conduct. And if capital consultants Oh, I see what you're saying. stands for anything is that there's lately been a proliferation of conflicts of interest and a lack of respect for professional standards, and that's how this case arises in the first place. Mr. Carson, let me ask you a couple of questions that may or may not be in the record, but I'd like to, if you can help me on it. Do any of the insurance companies who paid the third-party claims have rights of subrogation to distributions from the receiver? They do not for two reasons. Generally, the class action settlements contained policy releases with the insurance companies where they waived any rights to subrogation. As a matter of law, I'm not aware of any carrier that would have a right of subrogation because nobody has been compensated 100%. On these fiduciary liability policies, the right of subrogation does not kick in until someone's recovered 100% of their damages. And right now, no one will even get 100% of MIMO, so that's just not going to happen. Given the cap in the plan preventing a recovery of excess of 100%, even if the numbers worked out to produce more than 100%, the plan will prevent that from happening. Correct. I'm not aware of a single plan that can hit 100% of MIMO. I mean, we will be millions short. Everybody's under water. Yes, exactly. Okay, and my second question is, is there any proof regarding the existence of any tolling agreements to try and circumvent the offset rule? Well, gee, I know of some, but I'm not sure if they're in the record. If there are, they would have to be contained, and I don't know specifically. The receiver periodically reports based upon disclosures that the plan required. I have read all the disclosures, and for all the plans that really aren't doing anything, they're really pretty vague. So I'm not sure. I can give you a live example, though. About a month from today, we will be mediating with the Insurance Guarantee Associations for Legion Insurance. That's the insurer that covered our class actions. Legion went into liquidation owing about $5 million to $6 million. What should I do? Now, I can go in there asking for everything, knowing full well, if I settle, I am going to be getting a discount. Would I be prudent? In fact, indeed, am I required to be prudent to stall? Or to say, listen, if I recover from you now, I have to pay 50% over there. How about if you weigh the statute of limitations on the understanding that you pay me only 75% of what you owe? In other words, you and I will split that 50% discount. That's another possibility. And that's why this plan shouldn't be there in the first place, because you've seen why this should be reversed on the de novo standard, because it's a violation of the law. But it's also an abuse of discretion in the sense that it creates more problems than it can possibly solve. I shouldn't have to be worrying about that calculation. I shouldn't have to be worrying about other plans calling me up and saying, what did you take that for? Why didn't you do this? Or should I be calling these other plans and saying, you guys aren't investigating yourselves strongly enough. If you don't, I will. That costs our plans money. All of these things show the impracticality and the unfairness of that plan. And it is not a matter of favoring one over another. There's simply a line that cannot be crossed. A plan that's not entitled to these funds in the first place is not harmed by not getting them. And if I may, one question that hasn't come up too much is the question of collateral sources. These are, the insurance recoveries are explicitly collateral sources. And there is. Oh, I have to distinguish between TORC feesers and this private fund. I think there's a substantial difference between trying to give the TORC feeser something. But anyway, may I interrupt? This may have been the question that we just talked about. Is there a lot more going to happen? This last point you made attracted my attention. Is there a lot more going to go on for these third-party claims? I'll answer that as quickly as I can because I'd like to reserve one minute for rebuttal. As far as a lot more, here's what I'm aware of. My plans have claims against insurance guarantee associations in five states because of the default of Legion Insurance. The Department of Labor has approximately seven actions, I believe, filed against plans largely in the Midwest. There have been settlements of Department of Labor claims against funds in Nevada, totaling, I think, approximately $5 million. There are, as far as I know, two outstanding service provider claims, one by the Nevada Carpenters against Wertz & Associates, one here locally against Smith Barney. I do not know the amount of insurance coverage or the amount of those claims, so I couldn't tell you what they would even result in. Well, that's enough to make me think maybe if we affirm that there's going to be a long time before this fund is going to be distributed. Well, if you affirm, the receivership closes and those who wait the longest don't have to share. So if you're going to affirm, the best thing for us would be if you affirm two years from now. There's no – this was a 54-B appeal. Yes. There's no room for the receiver to say, well, we've got so much third-party claims yet to be decided, I want to wait on them. That is not what the receiver said he was going to do when this plan was proposed. The point was to get the receivership closed at a date when all the money was ready to distribute. And I believe the receiver – you can ask Mr. Patterson. I believe the receiver is pretty close to having recovered all the money he's going to. Let's break right there. We'll ask him and we'll give you a minute. All right, thank you. Okay. So how about it? When does this plan close if we affirm? It's unknown. I know the district court would like to get the case concluded as soon as possible. However, there are disputes with other claimants. There's other appeals that have been filed. Let me ask it this way. Does your client intend to close out the receivership before all the possible third-party recoveries are resolved? My client would intend to close the case when he is convinced, based upon the reporting that is required from each of the clients, that all the third-party recoveries that are likely to be recovered have been pursued and recovered. So some of these suits take five years. This stays open five years? Well, the case would stay open or an escrow fund could be established, as in the in-right cement and concrete case. We have reserved, explicitly reserved in the plan, a certain amount to account for third-party recoveries. What do we have in the record? Because this may prove to be an important point. I'm not sure. But what do we have in the record that can tell us what's going to happen here? Because as we've just been hearing, there's a real possibility for gaming the system. For example, if we know that the receivership is going to be closed out if we affirm within the year, there will be a substantial incentive not to recover third-party claims until after it's closed out. What's in the record is this, and Judge King did address it in his opinion. What he said was, I understand there is a possibility that some people might game the system. And so what we have in the plan are reporting requirements. Every six months, every claimant is supposed to report all possible sources and all efforts made to pursue those sources. And they're supposed to submit them to the receiver and to the Department of Labor. And if the receiver concludes that somebody is gaming, and that includes tolling agreements, and if the receiver concludes that somebody is gaming the system, then the receiver has the discretion under the court's order to come back into court and ask for the appropriate relief, whether it be continuing the case or modifying that particular client's claim in another way. So there is a safeguard there, and that's why we have the reporting. And in fact, although this isn't in the record, we've been talking about what recoveries have been had more recently, there were tolling agreements reported. And we did follow up with the attorneys who represented those clients who had tolling agreements. And it did cause them to pursue those claims, and I believe they are some of the claims that Mr. Carson referenced with respect to Nevada. So I assume that if a party did engage in gaming, while there might be information being hidden from the court, the court has provided presumably enforceable through its contempt powers for appropriate action to be taken if those facts later become known. Contempt powers or perhaps even a further modification of the plan whereby we would establish a separate reserve for that particular client. Well, what are we talking about now in terms of what's left in terms of the amount of money to be distributed? Approximately $76 million has yet to be distributed. Roughly speaking, what's the total dollar amount possibly recovered or possibly at issue with respect to these third party recoveries? Right now, our estimate is about $30 million. Of total possible recoveries? Total recoveries. Right, so that the net effect that we're talking about on the 50 percent in real gross figures here is $15 million. And how much do we have in hand in terms of third party recoveries already sort of, as it were, in the pocket? I won't say whose pocket because that's the issue, but in the pocket. Right, right. Our best estimate at this point, because the reporting is only officially every six months, is approximately $15 million. Then they can tell us if they think there's a different number. Right, right. And I think Mr. Carson made my original point pretty well when he said that the plans, the Eighth District plans, went out and sued their trustees and sued their service providers and mitigated their losses. That's what caused this whole provision in the first place. The underlying principle we all can agree on with receivership, and that is to say similarly situated claimants should be treated similarly, dissimilar, dissimilar. Okay. What do you respond to the argument that says, and I'll take a clean one, I spent assets of my plan to purchase insurance. I didn't have to, but I did. I went to a particularly high-priced accounting firm or a law firm to protect myself. I didn't have to, but I did. And because everything's gone bad, I'm now in a position to recover on my insurance policy that I voluntarily purchased with my own money. I'm in a position to recover from deep pocket law firm A, B, and C. That was my investment undertaken voluntarily by me. There's another plan over there that could have done exactly as I did. However, they declined to take out insurance. They declined to get financial advice. They simply invested. Why should my prudence and my investment now be taken away from me to take care of that imprudent, unforesightful, stingy person? That's the argument. What's the response? The response is you get to keep every penny you collect from those sources. No, that is not true. You get your recovery from the other deducted by half. So come on, let's talk straight, and then you can give me a different answer. Of course you get to keep every penny you collect from them, but the recovery you otherwise would get is reduced by half of that amount. So talk straight. Right, and because your losses have been reduced. Now, you say because I had the foresight to hire a lawyer. Or some other advisor. Who then became a contributing tortfeasor. You didn't hire that lawyer to be an insurance policy. Well, of course I did. My lawyers malpractice, I get money. That's what you do. Isn't that why you hire lawyers? Some of us first like the notion that we're being hired as insurance policies. But in that case. Let's keep it to insurance. And I do think insurance is a little bit overplayed here, because I think the unstated assumption is that we've got a first party insurance policy, and they're making a claim on it based upon premiums that they paid directly. And A, I don't know that it isn't in the record. And B, I don't know that it makes up a significant amount of the claims. Let's just stay with that. Okay, let's say that we've got one policy that's paid off some small amount, $100,000. But they paid for it. So why should they have to give up what they paid for and share it with somebody who didn't pay for it? I won't debate you on the point of whether they're giving up any portion of it. I will say this. Yeah, please don't, because that's just playing with the numbers. I will say this. We haven't. We are not requiring 100% offset. We're only recovering 50% of the net. They only have to pay half of what they paid for to somebody else. Presumably, the premium they paid is far less than the recovery they get. Typically, you don't... I understand that, too. Okay. That's in the nature of insurance. Right. Do you have any more answers? They were prudent enough to reduce their loss. They were. And others didn't have that protection. Maybe others didn't have service providers either who were negligent. Yeah. So I'm trying to figure out why it's fair to subsidize the people who, and I'll stay with the clean insurance example, who didn't want to spend the money for insurance. Perhaps because, in other cases, they were not able to buy insurance. Remember, these were not all ERISA plans. There were a lot of individual investors, private investors. I don't know that there's... I mean, there may be. But it may be possible that they just didn't have the opportunity to buy insurance. So is it fair to say that a majority of the claims are malpractice-type claims against third-party consultants or providers? I would say malpractice, yes. Negligence, professional negligence claims. Because I assume most of the E&O policies were, at least under the statute, they're fairly nominal, like half a million or a million. I think there are two different things, and perhaps this is a better question for Mr. Carson. I think he talks about the fidelity bonds, which are one thing, and then there are the actual lawsuits for professional negligence filed against the lawyers and the service providers. No, I understand, but we've been talking about insurance policies, and I will ask him when he comes back up, that assume large policies, but I'm not so sure that these policies are all that big, even if they purchase them. And I can't speak to that. I don't have information on that. We may hear from you again. To answer your question, the majority, both numerically and probably in terms of value, of the outstanding claims are claims brought by the Department of Labor against trustees for breaching their fiduciary duties for making these investments. Those claims are covered by insurance. It is very difficult to buy fiduciary liability insurance in any significant amount. I'm aware of one policy that may be as high as $5 million. The others are considerably less, probably one to two. I think it's safe to say that for the vast majority of those claims, if not all of them, the claims exceed the policy limits of the insurance, which is one of the reasons these cases were able to settle. But these losses are so big that they're over the policy limits virtually every time. And so there are two claims. What's happening is that the company's just paying policy limits. Well, not without a fight. But it's either burn it all up and defending it or pay it out, because you're going to pay it out one way or the other. You're right. They're burning limits policies as well, so defense costs reduce the amount for payout. So there's plenty of incentive to settle. When you talk about gaming the system, the question for you is why set up the game at all? We always, and I put this in my brief, we succumb to the desire to make rules and to fix things. We've got a touchstone here that's called ERISA, that means you've got to keep your hands off the plan assets of other plans. We've got other touchstones called the collateral source rule that keeps first-party insurance coverage. And these are the fiduciary liability claims or policies purchased by the plans to cover breaches of their fiduciaries. The bonds are required by ERISA. You have to buy one. When you make a claim on that, the money can only go to the affected plan. Those are absolutely collateral sources. The other claims against service providers are in the nature of professional malpractice claims. Primarily, you don't want to make them ERISA claims because of the limitations on remedies that you run into. There's nothing in the record to ever show an identity of claims. See, if I had a separate settlement with Wilshire, for example, I could understand an offset being made against a joint settlement that included Wilshire. Those offsets are built into the plan and nobody's fighting about those. Exactly. But when you have a claim against an entirely different entity on what really is an entirely different claim, it's related to capital consultants in the sense your money was lost through it. But that's really it. Relationships, facts, everything are different. And there's nothing in the record to show that identity. The cases we've cited... So we don't know out of the $30 million in third-party recoveries how much would be, for example, a Wilshire-related... You have no way of knowing that at all. No way. Okay. All right. Thank you very much, both sides. Continuing to be helpful arguments. The case number 03-35406, 8th District Electrical Pension Fund, is now submitted. The next case for argument is 03-35412, Oregon Laborers' Employers' Pension Trust Fund. Good morning, Your Honors. My name is Harvey Rockman. I represent the Oregon Laborers' Plans.
judges: Reavley , W. Fletcher, Tallman